NOV 14 2025 PM2:59
FILED-USDC-CT-HARTFORD

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN RE: SEIZURE WARRANT | No. 3:25-mc-106 (TOF)

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEIZURE WARRANT**

I, Michael Grabowski, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code. I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) and have been so since June 2023. Additionally, I am a sworn member of the Connecticut State Police and have been so since June 2012. I presently am assigned to work a variety of criminal matters, including the investigation of financial crimes such as wire fraud, mail fraud, cyber enabled fraud, as well as money laundering. I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches and seizures, the drafting of search and seizure warrant affidavits, and probable cause. By virtue of my assignment as a TFO with the FBI, I perform various tasks, which include, but are not limited to:

a. Interviewing witnesses, confidential sources (CS) and sources of information (SOI) relative to the commission of federal crimes;

b. Functioning as a case officer, entailing the supervision of specific investigations involving federal crimes;

c. Drafting and executing numerous and varying investigative reports and affidavits relative to the commission of federal crimes.

2. I perform investigations involving both domestic and international targets that utilize electronic devices and the financial infrastructure in the furtherance of such violations. Through my position, I have received training in money laundering, asset forfeiture, and cryptocurrency investigations.

3. The statements in this affidavit are based on my personal knowledge, from information I have received from other law enforcement personnel, from persons with knowledge regarding relevant facts, from interviews, from records that I have obtained through the service of federal grand jury subpoenas and from records obtained without the use of grand jury subpoenas. Because this affidavit is being submitted for the limited purpose of securing a seizure warrant as outlined above, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are sufficient to establish probable cause to believe that the Subject Property constitutes traceable proceeds derived from the Subject Offenses and/or the Subject Property is involved in violations of the Subject Offenses.

## I. SUMMARY OF PROBABLE CAUSE

4. This affidavit is submitted in support of an application for a seizure warrant to seize and preserve for forfeiture the equivalent value of Tether (hereafter, "USDT"), as currently associated with the following address: **TSGDm**A5ftoK5qJBnACrUUZzdd4viY9haq9 ("Subject Property" or "Target Address"), which consists of cryptocurrency[1] units. Based upon the information contained

[1] Cryptocurrency is a type of virtual currency in a decentralized, peer-to-peer network medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or

in this affidavit, there is probable cause to believe that the Subject Property constitutes traceable proceeds of a wire fraud scheme and that the Subject Property is involved in money laundering, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1956 ("the Subject Offenses").

## II. FACTS SUPPORTING PROBABLE CAUSE TO SEIZE THE SUBJECT PROPERTY

### A. BACKGROUND ON CRYPTOCURRENCY

5. Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

a. **Cryptocurrency**, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin ("BTC"), Solana ("SOL"), and Ether ("ETH"). Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software

---

exchanged for fiat currency or other cryptocurrencies. Individuals can obtain cryptocurrency through exchanges and other intermediaries, person-to-person transfers, the sale of goods or services, or mining. There are thousands of types of cryptocurrencies, including Bitcoin, Tether, and Dogecoin.

operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[2] Cryptocurrency, itself, is not illegal in the United States.

b. **Bitcoin ("BTC")** is a cryptocurrency that is open source, public, has a blockchain, and operates as a decentralized peer-to-peer electronic cash system designed to enable direct online payments without the need for financial intermediaries. The public ledger is the digital trail of the Bitcoin blockchain, which allows anyone to track the movement of BTC. The Bitcoin network enables users to send and receive value globally through a proof-of-work consensus mechanism where miners validate transactions and secure the network by solving cryptographic puzzles, all while using the Bitcoin blockchain protocol to maintain transparency and immutability. The platform's focus on decentralization, security, and a fixed supply cap of 21 million coins is one of Bitcoin's distinguishing characteristics and an important feature for users seeking a censorship-resistant store of value and medium of exchange. Transactions on Bitcoin are verified by network nodes and recorded in blocks that are added to the blockchain approximately every 10 minutes, with these transactions being both transparent and irreversible once confirmed by multiple blocks.

[2] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

c. **Tron ("TRX")** is a cryptocurrency that is open source, public, has a blockchain, and is distributed on a platform designed for decentralized content sharing and entertainment applications. The public ledger is the digital trail of the TRON blockchain, which allows anyone to track the movement of TRX. The TRON network enables developers to create decentralized applications (dApps) and deploy smart contracts that can facilitate content distribution, digital asset exchanges, and entertainment services without intermediaries or centralized control, all while using the TRON blockchain protocol to maintain transparency. The platform's focus on high throughput and low transaction costs is one of TRON's distinguishing characteristics and an important feature for developers building consumer-facing applications on the TRON blockchain. Smart contracts on TRON automatically execute according to the terms written into code, with transactions occurring on the TRON blockchain that are both trackable and irreversible.

d. **Tether ("USDT")** and **USD Coin ("USDC")** are alternative types of cryptocurrency or altcoin tokens. Payments or transfers of value made with USDT and USDC are recorded on whichever blockchain network they exist, but unlike decentralized cryptocurrencies like BTC, USDT has some anatomical features of centralization. One centralized feature is that USDT and USDC are "stablecoins," where the value of the digital asset is pegged to a reference asset (in this case, the US dollar); for each USDT and USDC issued, the tokens are represented to be backed by $1 of asset reserves. These characteristics make them theoretically less volatile than BTC, and consequently wallet holders often hedge their

cryptocurrency holdings into USDT in an attempt to protect their receipt or earnings value, so it is not affected by the rest of the cryptocurrency market.

e. **Tether Limited ("Tether")** is the company that manages the smart contracts and treasury (*i.e.*, reserve assets) for USDT. Because Tether manages the smart contracts for USDT, they are able to blacklist addresses containing USDT. For example, as is relevant to this application, Tether can blacklist addresses on the Tron network, rendering them inaccessible to whomever controls the private keys. In the instant case, at the request of law enforcement, Tether acted to freeze/blacklist the USDT associated with the Subject Property and has indicated that they will continue to do so until they receive a seizure order.

f. Cryptocurrency is stored in a virtual account called a **wallet**. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is usually represented as a case-sensitive string of letters and numbers, 26–90 characters long, often depending on the cryptocurrency protocol. Each public address is controlled and/or accessed using a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address's private key can

authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

g. Although cryptocurrencies such as BTC, ETH, and USDT have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes—for example, as payment for illegal goods and services and to commit money laundering. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases.

**B. Background of Investigation**

6. On October 7, 2025, the victim A.D., who is a resident of Putnam, CT, filed a complaint with the Connecticut State Police, Troop D, regarding a theft of cryptocurrency which was then-valued at approximately $37,534.95. Trooper Michael McCormack #888 contacted the affiant and requested assistance with the investigation.

7. The victim attempted to create a business account through the Strike application[3] on October 2, 2025, but was unable to verify the account. After sending an email inquiry on October 3, 2025, with no response, the victim researched alternative contact methods for Strike. Strike is a digital payment application which allows users to send and receive payments using the Bitcoin network.

8. On October 6, 2025, at approximately 9:30 AM, the victim found a phone number (1-801-730-9692) purportedly for Strike business account assistance. The victim spoke with an

---

[3] According to open-source research, Strike is an application designed to, among other things, allow customers to make a transaction where the customer uses cash to make the payment but the recipient receives Bitcoin.

individual named "Steve" who demonstrated knowledge about creating business accounts. During this initial call around 12:14 PM, Steve instructed the victim to send $969.89 worth of Bitcoin (775,404 sats) through CashApp, which the victim believed was a legitimate fee for starting the business account with Strike. A "sat" is the smallest unit of Bitcoin.

9. During this call and the calls references below, the victim was located in the District of Connecticut and used a telephone located in the District of Connecticut.

10. Your affiant knows from training and experience that open-source searches (for example, through a search engine) for customer service numbers often result in victims inadvertently using scam numbers. Scammers will associate alternate phone numbers with services (here, Strike) in various webpages so that these numbers are displayed as search engine results.

11. The number called by the victim was not actually associated with the Strike application. Steve was not an employee of Strike and his representations (both above and set forth below) to the victim were false.

12. At approximately 3:50 PM the same day, the victim called the number again and continued the account setup process. Steve had the victim download Zoho Assist Customer App, granting remote access to the victim's phone screen. Using email ansh31691@gmail.com and session ID 340012457, Steve guided the victim through multiple steps, including logging into the victim's personal Strike account containing 30,002,606 sats (valued at $37,534.95) and transferring the entire balance to crypto wallet address **bc1qnw**sngaxahyshq264avd9ujc07d6nlrn9mpdgyh. In this transfer, 30,002,606 sats was equal to approximately 0.299265 Bitcoin.

13. Steve then instructed the victim to download BlueWallet Bitcoin Wallet and attempted to have the victim set up a Bitcoin/Crypto Wallet in Fidelity. Steve asked multiple times if the victim had other crypto wallets and requested a total of $80,000 for the business account, wanting the victim to liquidate assets to have this amount in the Strike account. The victim became suspicious after this request and refused to sell assets, noting it was after trading hours. Steve requested the victim call back around 9:30 AM the next day, stating it would take 24 hours for accounts to synchronize.

14. On October 7, 2025, at approximately 9:38 AM, the victim called 1-801-730-9692 again. A woman answered, stating Steve was not available, which confirmed the victim's suspicions about being scammed. The victim immediately went to CSP Troop D at 3:55 PM and reported the incident to Trooper McCormack #888, providing all transaction details from October 6, 2025, and completing an IC3 report online

15. Trooper McCormack relayed the above information to me. Using proprietary blockchain analysis software, I identified and traced the victim's stolen Bitcoin. I confirmed that the Bitcoin was sent from the victim's Strike account to **bc1qnw**sngaxahyshq264avd9ujc07d6nlrn9mpdgyh. The full amount passed through a second wallet with address **3Ewbi5**4eQyMZQJzooY7nck6tjYbL9o177W. From **3Ewbi5**, the Bitcoin was sent to ChangeNow.io.

16. ChangeNOW.io is a non-custodial cryptocurrency exchange platform that enables users to swap between different cryptocurrencies quickly and without creating an account. As an instant exchange service, it allows users to convert one crypto asset to another (for example,

swapping Bitcoin for Ethereum, or Litecoin for USDT) without the need to register, verify their identity through KYC (Know Your Customer) processes, or deposit funds into a custodial wallet.

17. On 10/09/2025, I submitted an information request to ChangeNow.io for the specific transaction containing the victim's Bitcoin. I identified the transaction by the hash (09938d0cfc2305ad67561a842a682ba5210116c4af5e08521b3f08270eb2a180) and the destination ChangeNow.io wallet address (**37jdMX**Ybvg3dKzJ4pGSYiABiXoBy4putZq). ChangeNow.io replied the same day with detailed transaction information.

18. I viewed the transaction information and determined that the victim's Bitcoin was swapped to Tether ("USDT") on the Tron network. The total amount of USDT purchased was 36,867 (at the time worth $36,878.35). The USDT was sent to payout address **TSGDmA**5ftoK5qJBnACrUUZzdd4viY9haq9, the Subject Property, using hash 7ab60e78adb29fc9df41daf370d503c20feada40017454ee3f761368ce87f0a8.

19. On 10/10/2025, I noted that the Subject Property contained all of the USDT proceeds derived from the victim's Bitcoin. In fact, that deposit of USDT into that wallet was the only USDT transaction received. Therefore, the full amount currently contained in the Subject Property is derived from the victim's Bitcoin.

20. On 10/10/2025, I submitted a freeze request to Tether Limited for the Subject Property. On 10/13/2025, Tether initiated the freeze. As of this writing, 36,867 USDT remains in the Subject Property.

21. Based on the rapid nature of the cryptocurrency transactions and the use of an instant swapping service to further obfuscate the source of the funds, the Subject Property and the contents therein are involved in money laundering and contains the contents of wire fraud.

## CONCLUSION

22. Based upon the information set forth above, I respectfully submit that there is probable cause to believe that the **Subject Property** constitutes traceable proceeds of a wire fraud scheme and that the **Subject Property** is involved in money laundering and/or contains the proceeds of money laundering, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1956. The **Subject Property** is subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C) for violations of 18 U.S.C. § 1956 and under 18 U.S.C. § 981(a)(1)(A) via 18 U.S.C. § 1956(c)(7)(A) (defining specified unlawful activities to include offenses listed in 18 U.S.C. § 1961(1)) and 18 U.S.C. § 1961(1) (covering 18 U.S.C. § 1341 and 18 U.S.C. § 1343) for violations of 18 U.S.C. § 1343. The **Subject Property** is subject to criminal forfeiture under 18 U.S.C. § 982(a)(1) for violations of 18 U.S.C. § 1956 and 18 U.S.C. 981(a)(1)(A) via 18 U.S.C. § 1956(c)(7)(A) (defining specified unlawful activities to include offenses listed in 18 U.S.C. § 1961(1)), 18 U.S.C. § 1961(1) (covering 18 U.S.C. § 1341 and 18 U.S.C. § 1343), and 28 U.S.C. § 2461 (permitting criminal forfeiture if civil forfeiture is permitted) for violations of 18 U.S.C. § 1343.

**Left Blank Intentionally**

23. I request that the Court issue a seizure warrant pursuant to pursuant to 18 U.S.C. § 981(b), 18 U.S.C. § 982(b)(1), and 21 U.S.C. § 853(f).

Michael Grabowski Digitally signed by Michael Grabowski Date: 2025.11.14 05:46:06 -05'00'

Michael Grabowski
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me via Teams on this 14th day of November, 2025 in Hartford, Connecticut.

Thomas O. Farrish Date: 2025.11.14 11:30:28 -05'00'

THE HONORABLE THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE